IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                              Cr. No. 04-666 JP

TRAVIS DENNY,

    Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

        On July 28, 2004, Defendant Travis Denny filed a Motion to Suppress (Doc. No. 23). The Defendant asked the Court to suppress cocaine found in Defendant's possession and Defendant's post-arrest statement. Defendant's motion presents a comparison of facts sufficient to give a law enforcement officer reasonable suspicion to seize an object, temporarily for limited purposes, versus facts needed to allow an officer to search the object without probable cause and without any applicable exceptions to the warrant requirement. On October 28 and 29, 2004, the Court held a hearing on the Defendant's Motion to Suppress. At the hearing, Assistant United States Attorney Elaine Ramirez represented the United States of America (USA) and Attorney Joe Romero represented the Defendant who also was present. Having considered the briefs (including supplemental briefs), testimony, and oral argument of counsel, the Court concludes that Defendant's Motion to Suppress should be granted.

A. Background[1]

The Defendant is charged with one count of possessing with the intent to distribute 500 grams or more of cocaine on March 17, 2004. Superseding Indictment (Doc. No. 29), Aug. 11, 2004. The Superseding Indictment includes a sentencing allegation that the Defendant willfully obstructed, impeded or attempted to impede the administration of justice by striking a government official and attempting to flee with the cocaine he possessed.

On March 17, 2004, the Defendant was onboard the Amtrak train when it stopped in Albuquerque, New Mexico. Amtrak personnel provided DEA agents with passenger and ticketing information about the passengers onboard that train. This information included the fact that Defendant had purchased a one-way ticket from Los Angeles, California to Newark, New Jersey with a VISA debit card the day prior to the train's departure from Los Angeles. Before boarding the train, DEA agents ran a criminal history check on the Defendant and found that he had several prior drug-related convictions. Agent Dorian also spoke with a train attendant who said the Defendant had not exhibited any unusual behavior while on the train. Agent Dorian, nonetheless, wanted to speak with the Defendant based on the ticketing information and Defendant's prior drug convictions.[2]

At about 1:00 p.m. Agent Dorian and DEA Agent Ron Deist encountered the Defendant in the common luggage area of the Amtrak train. Defendant was speaking on a cell phone with

---

[1]The Court accepts as credible the version of the facts presented by Drug Enforcement Agency (DEA) Special Agent Will Dorian.

[2]DEA agents also were interested in other passengers on that train who had purchased one-way train tickets with cash shortly before the train departed from Los Angeles. Agent Mark Hyland spoke to a couple of those passengers in Albuquerque.

his girlfriend, Sherrill Cassett.  Agent Dorian interrupted the Defendant's cell phone conversation after a couple of minutes and identified himself to the Defendant.  Although Agent Dorian had a badge around his neck, he was in plain clothes and his handcuffs were not visible.  Agent Dorian was not carrying a gun.  Agent Diest also wore plain clothes.  His badge and weapon were not visible.  Agent Dorian asked if he could speak with the Defendant.  Defendant agreed.  Defendant told Agent Dorian that he was staying in a sleeper room and that he was traveling from Los Angeles to Newark.  Defendant also told Agent Dorian that he had purchased a last-minute, one-way ticket for a room on the sleeper car, and that he had flown from New Jersey to California.

Agent Dorian knew, based on his training and experience, that narcotics couriers often fly to the west coast, and then travel by train back to the east coast with narcotics.  The couriers usually purchase train tickets for one-way travel soon prior to departure.  Moreover, Los Angeles is a drug source city and Newark is a narcotics destination city.

During his initial encounter with Defendant, Agent Dorian believed that Defendant was "a little bit nervous" because Defendant's hands were shaking "a little bit" and Defendant would not make eye contact with Agent Dorian.  When Agent Dorian asked the Defendant if he had any luggage, Defendant pointed to a blue duffel bag in the common luggage area.  The Defendant also told Agent Dorian that he had another bag in the sleeper room.  Defendant consented to the search of the two bags.  Agent Ron Deist searched the blue duffel bag in the common luggage area and found nothing incriminating.

Agent Dorian then followed the Defendant upstairs to the sleeper room.  Defendant stepped into the sleeper room and Agent Dorian stood partially in the sleeper room.  The door to the sleeper room was open at all times.  A gym bag was on one of two seats in the sleeper room.

Defendant partially unzipped the gym bag in the sleeper room and removed a pair of shoes and then zipped the gym bag closed.  While the gym bag was open, Agent Dorian saw other things, besides the shoes, in the gym bag.  Agent Dorian then asked if he could look into the gym bag without the Defendant's assistance.  The Defendant replied that the gym bag had already been searched.  Agent Dorian tried to explain to the Defendant that he wanted to look inside the gym bag himself. Agent Dorian, therefore, asked the Defendant in several different ways if he could personally search the gym bag.  Finally, Agent Dorian decided Defendant was no longer consenting to a search of the gym bag.  Agent Dorian then asked if the Defendant would allow a narcotics dog to sniff the gym bag.  Defendant agreed.

     Agent Dorian then stepped into the hallway to call the K-9 unit.  While Agent Dorian was trying to contact the K-9 unit, Defendant stepped out into the hallway where he became agitated and upset about being singled out for a search.  Based upon Agent Dorian's training, education and experience, persons who become agitated and raise their voices usually do so because of the presence of narcotics.  The Defendant then calmed down and asked Agent Dorian for a cigarette. Agent Dorian did not have a cigarette.  While waiting for the dog to arrive, Defendant asked if he could leave the sleeper room to smoke.  Agent Dorian thought that the Defendant's desire to smoke indicated some nervousness.

     Agent Dorian told Defendant that he was not being detained and that he could leave. Defendant did not leave but instead paced the hallway and re-entered the sleeper room.  Agent Dorian heard the Defendant again open the gym bag and saw the Defendant remove a plastic bag containing a "Ritz" cracker box from the gym bag.  Defendant placed the plastic bag under the seat opposite of the seat upon which the gym bag was located.  The door to the sleeper room was

4

open while the Defendant removed the plastic bag from the gym bag. The Defendant then informed Agent Dorian that he could now search the gym bag. When Agent Dorian stepped into the sleeper room and looked inside the gym bag, he found nothing incriminating.

Agent Dorian asked Defendant about the plastic bag on the floor underneath the other seat. Defendant denied that it was his. This denial heightened Agent Dorian's suspicions that there was something illegal in the plastic bag. At that point, Agent Dorian considered the plastic bag abandoned. Agent Dorian then stepped back out into the hall. The Defendant was standing in front of the doorway to the sleeper room.

Agent Dorian then asked the Defendant if he could conduct a pat down. The Defendant agreed. Agent Dorian patted the Defendant while the Defendant was standing in the doorway to the sleeper room. DEA Agent Mark Hyland approached the sleeper room as Agent Dorian was conducting the pat down. Agent Hyland was dressed in plain clothes. His gun and handcuffs were not visible.

After having found nothing dangerous on the Defendant, Agent Dorian reentered the sleeper room without asking Defendant if he could do so, reached under the seat, and picked up the plastic bag by holding the sides of the plastic bag against the cracker box. Although the plastic bag had handles, Agent Dorian did not use those handles to pick up the plastic bag and cracker box. The cracker box was unusually heavy for a box of crackers. When Agent Dorian manipulated the box with his hands, it felt to him as though there was a brick inside instead of crackers. Agent Dorian previously had felt similar packaging when he once had handled a 12-can Pepsi box that contained a kilo of cocaine packed inside. Agent Dorian proceeded to reach inside the plastic bag and to open the cracker box which was closed but not sealed. Agent Dorian saw a

duct-taped bundle consistent with the packaging of illegal narcotics inside the cracker box.

Agent Dorian tossed the plastic bag with the cracker box toward Agent Hyland so Agent Dorian could get out his handcuffs. The plastic bag, however, landed on the floor. At this point, the Defendant pushed Agent Dorian against the wall of the hallway and picked up the plastic bag. Defendant left the area going down the hallway away from the agents and ignored several commands by Agent Dorian to stop. Defendant was also told he was under arrest but continued on his way. Agent Deist encountered Defendant in the common luggage area where Agents Deist, Dorian, and Hyland tried to apprehend Defendant. As the Agents wrestled the Defendant to the ground to handcuff him, the Defendant threw the plastic bag with the cracker box under the train. The plastic bag and the cracker box were retrieved from underneath the train and found to contain one kilogram of cocaine.

B. Discussion

    1. Whether the Initial and Subsequent Encounters were Consensual

The Defendant argues first that the initial encounter with Agent Dorian in the common luggage area was not consensual. The Defendant further argues that even if the initial encounter was consensual, the encounter in the sleeper room was not consensual and that Agent Dorian lacked reasonable suspicion to seize the plastic bag with the cracker box. "[T]here are three categories of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment[;] (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity[;] and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999), *cert. denied*,

6

531 U.S. 830 (2000)(citing *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996)). Police questioning alone does not constitute a seizure. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). For example, a police officer can ask for a person's identification, request consent to search bags, and generally ask questions of a person even if the officer has no basis for suspecting a particular individual of any wrongdoing "as long as the police do not convey a message that compliance with their requests is required."[3] *Id.* at 435. However, "'[a]ccusatory, persistent, and intrusive' questioning can turn an otherwise voluntary encounter into a coercive one." *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995). The Supreme Court "adhere[s] to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439.

Factors to be considered in determining whether an encounter was consensual include whether there was a use of force, an intimidating movement, an overwhelming show of force, the brandishing of weapons, the blocking of exits, threats, commands, or the use of an authoritative tone of voice. *United States v. Drayton*, 536 U.S. 194, 204 (2002). Other factors include whether the police officer "advised the defendant he had the right to refuse consent" and "the

---

[3]Generally, "[t]he asking of 'incriminating questions' is irrelevant to the totality of the circumstances surrounding the encounter." *United States v. Little*, 18 F.3d 1499, 1506 (10th Cir. 1994).

particular location of the encounter."[4] *United States v. Broomfield*, 201 F.3d 1270, 1274 (10th Cir.), *cert. denied*, 531 U.S. 830 (2000)(citing *Bostick*, 501 U.S. at 436-37. "No one factor is dispositive." *Id*. at 1274. Showing a badge, wearing a uniform, and being visibly armed, however, are factors with little weight in this analysis. *Drayton*, 536 U.S. at 204-05.

In this case, the initial encounter with the Defendant in the common luggage area was consensual. Agent Dorian and Agent Deist did not act or appear to act in an intimidating fashion and the location of the encounter was in a public area of the train. The circumstances surrounding the initial encounter would not have communicated to a reasonable person that the person was not free to decline Agent Dorian's request to search bags or to otherwise terminate the encounter.

The encounter in the sleeper room, however, was only initially consensual. Defendant agreed to have Agent Dorian search the gym bag in the sleeper room and later agreed to a dog sniff. The door to the sleeper room was open at all times. Moreover, prior to Agent Dorian's seizure of the plastic bag with the cracker box, Agent Dorian was mostly in the hallway, except for the short time he spent in the sleeper room, with Defendant's limited consent, to search the gym bag after the Defendant had removed the plastic bag with the cracker box. Although Agent Dorian asked Defendant a few times for permission to search the gym bag himself, Agent Dorian was not intimidating or excessively persistent. Agent Dorian also told the Defendant that he was

---

[4]The Tenth Circuit has rejected "the argument that the location of an encounter on a train (outside the train, in a public coach, or in a private roomette) is determinative of the seizure question." *Little*, 18 F.3d at 1504. In noting that the degree of expectation of privacy in a private roomette is not "the same degree of privacy as a dwelling or hotel or motel room," the Tenth Circuit also held that it did not need to decide "the precise level of any 'higher' expectation of privacy in a train roomette, however, because any such expectation of privacy has only a limited relevance to the question of whether a police-citizen encounter in such a roomette is consensual." *Id*. at 1504-05.

free to leave. Furthermore, the Defendant voluntarily consented to being patted down. A reasonable person would have felt free to decline Agent Dorian's requests or to terminate the encounter at the sleeper room up to the point Agent Dorian reentered the sleeper room, without Defendant's permission, and reached underneath the seat to pick up the plastic bag containing the Ritz cracker box. Once Agent Dorian grabbed the plastic bag, felt the cracker box inside the bag, and opened the box, a reasonable person in Defendant's position would have believed that Agent Dorian had discovered evidence of a crime justifying arrest and the person therefore no longer was free to leave. Nonetheless, the parties seem to agree that the key issues are whether Agent Dorian had reasonable suspicion to seize the plastic bag with the cracker box by picking it up from underneath the seat and whether Agent Dorian had probable cause to search the cracker box by opening it after reaching inside the plastic bag.

  2.  Whether Agent Dorian Lawfully Seized the Plastic Bag with the Cracker Box

Agent Dorian could have seized the plastic bag with the cracker box, temporarily and for limited purposes, if he had a reasonable suspicion that it contained narcotics or contraband and if he was lawfully in the sleeper room when he picked up the plastic bag. Courts use the same test to determine if an agent has reasonable suspicion to detain either a traveler or his luggage. *United States v. Hall*, 978 F.2d 616, 621 (10th Cir. 1992). An investigative stop, or *Terry* stop, must be supported by the officer's reasonable articulable suspicion that "criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989), *quoted in Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). "Based on the totality of the circumstances, the detaining officer 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Oliver*, 209 F.3d at 1186 (quoting *United*

9

*States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  Officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750-51 (2002).  In reaching a reasonable suspicion determination, the officer may consider in combination factors which alone are susceptible to innocent explanations. 122 S.Ct. at 753.

The USA argues first that merely picking up the plastic bag did not constitute a seizure. "A seizure of property . . . occurs when there is some meaningful interference with an individual's possessory interest in that property. . . . [N]o seizure occurs when an officer merely picks up an individual's property to look at it, because this interference with the individual's possessory interest is not meaningful." *United States v. Hall*, 978 F.2d 616, 619 (10th Cir. 1992) (internal quotation marks omitted).  In *Hall*, the agent picked up the defendant's suitcase in the common luggage area of a train.  Here, Agent Dorian picked up the plastic bag, without consent, inside the Defendant's sleeper room.  Defendant Denny had a reasonable expectation that his belongings inside his sleeper room would not be handled without his consent.  Therefore, Agent Dorian's picking up the plastic bag inside Defendant's room constituted a seizure.

The USA next argues that Agent Dorian had reasonable suspicion to seize the plastic bag with the cracker box. Factors supporting a reasonable suspicion that the Defendant may have been involved in criminal activity include the following:  Defendant purchased a one-way train ticket from a drug source city to a drug destination city; Defendant purchased the train ticket the day prior to departure from Los Angeles; Defendant exhibited nervousness as manifested by his agitation and desire to smoke while waiting for the K-9 unit; Defendant had prior felony drug

10

convictions; and DEA agents annually make 80-100 narcotics seizures on the Amtrak trains in Albuquerque.[5] Moreover, Defendant's strange contention that his unzipping of the gym bag and taking out a pair of shoes constituted the totality of a consensual search is another factor contributing to Agent Dorian's reasonable suspicion. In addition, Agent Dorian's observation of the Defendant removing the plastic bag from the gym bag and placing the plastic bag under a seat in the sleeper room would arouse a reasonable person's suspicion that criminal activity was afoot.[6] All of these circumstances including the agents' collective training and experience were sufficient for Agent Dorian to have developed a reasonable articulable suspicion that the plastic bag with the cracker box contained evidence of criminal activity.

Agent Dorian had reasonable suspicion to believe that the cracker box contained some type of contraband. The questions then become whether Agent Dorian lawfully reentered the sleeper room to retrieve the plastic bag with the cracker box from under the seat and detain it, and whether Agent Dorian exceeded the scope of permissible action by searching the object without a warrant or probable cause. Under Tenth Circuit precedent, the Defendant had some reasonable

---

[5]The collective knowledge of the agents can be used to justify a continued detention. *United States v. Cervine*, 347 F.3d 865, 871-72 (10th Cir. 2003). Moreover, the use of a drug courier profile "is a lawful starting point for police investigations." *United States v. Respress*, 9 F.3d 483, 484 n.1 (6th Cir. 1993)(quoting *United States v. Sokolow*, 490 U.S. 1 (1989)).

[6]The USA also argues that Agent Dorian could have lawfully seized the plastic bag with the cracker box based upon the plain view doctrine. An officer has probable cause to seize evidence without a warrant if it falls within the plain view doctrine. *United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002). "A warrantless seizure of evidence is sustainable if (1) the police officer was lawfully located in a place from which to plainly view the item; (2) the officer had a lawful right of access to the item; and (3) it was immediately apparent that the seized item was incriminating on its face." *Id*. "An item's incriminating nature is immediately apparent if 'the officer had probable cause to believe the object was contraband or evidence of a crime.'" *Id*. Even assuming that the first two elements of the plain view doctrine are met, I conclude that a reasonable police officer would not believe a Ritz cracker box is incriminating on its face.

expectation of privacy in the sleeper room. *United States v. Little*, 18 F.3d 1499, 1504-05 (10th Cir. 1994). The Tenth Circuit has not quantified exactly how much of an expectation of privacy a train passenger has in a sleeper room except to note that it is greater than that of a seat in a public passenger coach car, but less than that of a dwelling or of a motel room or hotel room. *Little*, 18 F.3d at 1504; *accord, United States v. Harfst*, 1996 WL 131501 *3 (10th Cir. March 25, 1996) (unpublished). Since the Defendant had at least some expectation of privacy in the sleeper room, the Court concludes that the Fourth Amendment would prohibit the unreasonable entry into his sleeper room by a law enforcement officer. In this case, Defendant consented to Agent Dorian's entering the sleeper room to inspect the gym bag, but he did not consent to Agent Dorian reentering the room after completing his search of the gym bag and then stepping outside of the room into the hallway to pat down the Defendant. Defendant's lack of consent to Agent Dorian's reentry into the sleeper room to retrieve the plastic bag with the cracker box made Agent Dorian's reentry unreasonable and therefore in violation of the Fourth Amendment.

  The USA argues that the "plain touch" doctrine provided a basis for seizing the plastic bag with the cracker box. The USA contends that the weight and contour of the cracker box provided reasonable suspicion that the cracker box contained narcotics. The USA cites to *Minnesota v. Dickerson*, 508 U.S. 366 (1993) to support the plain touch doctrine in a *Terry* situation. *Dickerson* did not involve the touching of a bag or luggage. Instead, *Dickerson* held that "[i]f a police officer lawfully pats down a suspect's outer clothing [during a *Terry* stop] and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same

12

practical considerations that inhere in the plain-view context." *Id.* at 375-76. A police officer, however, exceeds the lawful bounds of *Terry* when, without probable cause, the police officer squeezes the contents of the defendant's pocket knowing that there is no weapon in the pocket. *Id.* at 378.

In the context of an agent physically manipulating a canvas bag, the United States Supreme Court has held that although a bus passenger may expect to have his bag handled by bus employees or other passengers, the bus passenger does not expect to have his bag felt in an exploratory manner. *Bond v. United States*, 529 U.S. 334, 338 (2000). The physical manipulation of a bag in an exploratory manner constitutes a search requiring probable cause. *See id.* Consequently, the USA's assertion that squeezing a bag in an exploratory manner provides reasonable suspicion is incorrect, because that squeezing exceeds the lawful bounds of *Terry* and enters the realm of a search which requires probable cause.

In this case, Agent Dorian exceeded the lawful scope of a *Terry* detention of the bag when he handled and manipulated the plastic bag with the cracker box in an exploratory manner. This action constituted a warrantless search which requires probable cause. At that point, Agent Dorian did not have probable cause to search the cracker box by feel or by sight.[7] The USA's plain touch argument actually provides a basis for finding that Agent Dorian exceeded the lawful bounds of *Terry* by conducting an unlawful search of the plastic bag when he felt the cracker box in the manner he did.

---

[7] The USA does not argue that Agent Dorian had probable cause to search the plastic bag or the box. In fact, Agent Dorian admitted at the hearing that absent consent or abandonment, he had no probable cause to "seize" the plastic bag. Tr. 156-57, October 29, 2004 transcript. Lack of probable cause to seize the bag necessarily implies lack of probable cause to search it.

3. Whether Agent Dorian Could Have Lawfully Searched the Plastic Bag Without a Warrant and Without Probable Cause.

Even though the Court has found that Agent Dorian did not lawfully seize the plastic bag with the cracker box and that he conducted an unlawful search of the cracker box by manipulating the plastic bag and the cracker box, the Court will nevertheless address the USA's arguments regarding exceptions to the warrant requirement when probable cause is lacking.  "Although the Fourth Amendment may permit a brief detention of property on the basis of only 'reasonable, articulable suspicion' that it contains contraband or evidence of criminal actively, it proscribes-- except in certain well-defined circumstances–the search of that property unless accomplished pursuant to judicial warrant issued upon probable cause."  *Smith v. Ohio*, 494 U.S.541, 542 (1990)(citations omitted).  The USA justifies Agent Dorian's warrantless opening and search of the inside of the cracker box based on three theories:  consent, plain view and abandonment.

      a. Consent to Search the Cracker Box

The USA argues that the Defendant gave voluntary consent to search the gym bag as well as to obtain a canine sniff.  The government bears the burden of showing that a defendant voluntarily consented to the search in question. *See United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir.1996).  The government has not met its burden.

The evidence indicates that the Defendant initially gave explicit voluntary consent to search the gym bag when Agent Dorian encountered the Defendant in the common luggage area.  That consent was later withdrawn after the Defendant partially unzipped the gym bag in the sleeper room and pulled out his sneakers, but then zipped the bag closed.  The Defendant then declined to allow Agent Dorian personally to look in the gym bag, but consented to a dog sniff of

the gym bag.  The consent to a dog sniff is irrelevant because the dog sniff never occurred.  The Defendant later again consented to Agent Dorian's search of the gym bag after the Defendant had removed the plastic bag with the cracker box and placed the plastic bag under the seat in the sleeper room.  However, the Defendant never consented to Agent Dorian's separate search of the plastic bag and cracker box which no longer were inside the gym bag.

b.  Plain View

The USA argues that under the plain view doctrine it was a foregone conclusion that the plastic bag with the cracker box contained contraband. "[T]he plain view exception permits seizure of incriminating evidence, but does not authorize a warrantless search for concealed evidence." *United States v. Miller*, 769 F.2d 554, 558 (9th Cir. 1985).  "However, where the contents of a seized container are a foregone conclusion, this prohibition against warrantless searches of a container under the plain view doctrine does not apply.  [The Tenth Circuit has] held that when a container is 'not closed,' or 'transparent,' or when its 'distinctive configuration ... proclaims its contents,' the container supports no reasonable expectation of privacy and the contents can be said to be in plain view." *United States v. Corral*, 970 F.2d 719, 725 (10th Cir. 1992)(internal quotations omitted).  In sum, law enforcement agents should not be allowed to conduct a warrantless search of an unrevealing container even when circumstances support a strong showing of probable cause. *United States v. Donnes*, 947 F.2d 1430, 1439 (10th Cir. 1991)(citing *Miller*, 769 F.2d at 560).  In this case, the cracker box was closed (although not sealed), was not transparent, and its configuration was not so distinctive as to alert a reasonable police officer that it contained contraband.  It was not a forgone conclusion that the cracker box contained narcotics.  The plain view doctrine, therefore, did not justify a warrantless search of the

cracker box.

### c. Whether the Defendant Abandoned the Plastic Bag with the Cracker Box

The USA also argues that Defendant abandoned the plastic bag with the cracker box by disavowing ownership after he placed the object underneath the seat. The USA initially conceded in its response brief that Defendant's actions may not have arisen to the level of abandonment, but now contends that the Defendant by his comment disclaiming ownership had abandoned the plastic bag with the cracker box, and further that Agent Dorian had to pick up the plastic bag in order to ask other passengers whether it belonged to them. As discussed above, because he did not have Defendant's consent to reenter the sleeper room, Agent Dorian had not lawfully seized the plastic bag; consequently, he could not have lawfully picked it up to show to other passengers. The Court will nonetheless address the issue of whether a warrantless search was justified on the basis that the Defendant abandoned the plastic bag with the cracker box.

"'A warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment,'" because voluntary abandonment of property constitutes a forfeiture of any expectation of privacy the person may have had in the property. *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995)(quoting *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1989); *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.), *cert. denied*, 464 U.S. 859 (1983)). "An abandonment must be voluntary, and an abandonment that results from a Fourth Amendment violation cannot be voluntary." *Id.* (citation omitted). "The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object." *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.), *cert. denied*, 464 U.S. 859 (1983)(citations omitted). "This test of abandonment subsumes both a subjective and an objective component."

*United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997).  Findings of a subjective intent to abandon are findings of fact while "a determination of whether the defendant retained an objectively reasonable expectation of privacy in the property that society will recognize is a question of law...."  *Id*.  The Tenth Circuit has found property to be abandoned "where the defendant either (1) explicitly disclaimed an interest in the object, or (2) unambiguously engaged in physical conduct that constituted abandonment."  *Id*. at 1452.  Abandonment is not presumed and the party asserting abandonment must clearly show the abandonment.  *United States v. Robinson*, 430 F.2d 1141, 1143 (6th Cir. 1970).

   As previously discussed, a passenger traveling in a private sleeper room has a higher expectation of privacy than a person traveling in the public passenger car of the train but a lesser degree of expectation of privacy than that of a dwelling or hotel or motel room.  Although the door to the sleeper room was open so that the public could see in, as Agent Dorian did, and the Defendant disclaimed ownership of the plastic bag, the fact that he placed the object underneath a seat in his private sleeper room indicates a desire to keep the plastic bag from public scrutiny.  This is not a case where the Defendant gave the plastic bag to a stranger or discarded the plastic bag in a public area where anyone could have found it.  The circumstances indicated the Defendant expected the plastic bag to be safe in his private sleeper room from public intrusion.  Since the Defendant's actions with respect to the plastic bag are contrary to his disclaimer of ownership of the plastic bag, the Court cannot find that the USA met its burden of showing

clearly that the Defendant failed to retain any reasonable expectation of privacy in the plastic bag.[8] Therefore, Defendant had not abandoned the object.

Although Agent Dorian had reasonable suspicion to briefly detain the plastic bag and cracker box for a dog sniff, which would have provided probable cause to search the object, he exceeded the permissible scope of a *Terry* detention by searching the object. None of the exceptions to the warrant requirement that might have justified Agent Dorian's searching of the plastic bag and cracker box applies. Therefore, the search was unreasonable and violated the Fourth Amendment.

4. Defendant's Statement Following Advisement of *Miranda* Rights

The USA argues that the Defendant's voluntary confession of drug activities after he was arrested and advised of his *Miranda* rights provides admissible evidence of guilt. The Defendant argues that these statements should be suppressed under the fruit of the poisonous tree doctrine. The Court agrees with the Defendant.[9]

---

[8]The USA cites to *United States v. Burbage*, 365 F.3d 1174 (10th Cir. 2004), *cert. denied*, 2004 WL 2314964 as a factually similar case involving abandonment of a backpack on a train. *Burbage*, however, is distinguishable from this case because the backpack was left in an overhead luggage compartment in a public passenger car, not under a seat in a private sleeper room. *See also United States v. Gault*, 92 F.3d 900 (10th Cir. 1996)(no reasonable expectation of privacy when bag placed underneath seat in a public passenger car protrudes into aisle). The USA also cites to *United States v. Jones*, 914 F.Supp. 421 (D. Colo. 1996), *affirmed*, 124 F.3d 218 (10th Cir.1997) as a case similar to this one. That case is distinguishable because it involved a bag left on top of an empty bus seat in a very public area instead of underneath a seat in a private sleeper room.

[9]The USA failed to argue that the post-*Miranda* statements were purged of the taint from an illegal search by analyzing the factors set forth in *Brown v. Illinois*, 422 U.S. 590 (1975) to determine whether statements made to the police after an illegal search or seizure are not fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

IT IS ORDERED that:

1.  Defendant's Motion to Suppress (Doc. No. 23) is granted;

2.  the approximately one kilo of cocaine found in the Ritz cracker box is suppressed as the result of an illegal search; and

3.  Defendant's incriminating statements made to DEA agents after his arrest are suppressed as fruit of the poisonous tree.

_____
SENIOR UNITED STATES DISTRICT JUDGE